**SIGNED this 23rd day of March, 2012**

_____

Marcia Phillips Parsons
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

In re

APPALACHIAN OIL COMPANY, INC.,                     No. 09-50259
                                                    Chapter 11
                       Debtor.

APPALACHIAN OIL COMPANY, INC.,

        Plaintiff,

vs.                                                 Adv. Pro. No. 10-5057

THE KENTUCKY LOTTERY CORPORATION,

        Defendant.

## M E M O R A N D U M

APPEARANCES:

Mark S. Dessauer, Esq.              Michael W. Ewell, Esq.
Hunter, Smith & Davis              Frantz, McConnell & Seymour, LLP
Post Office Box 3740               Post Office Box 39
Kingsport, Tennessee 37664         Knoxville, Tennessee 37901
*Attorney for Plaintiff*           *Attorney for Defendant*

**Marcia Phillips Parsons, United States Bankruptcy Judge**. This is an action pursuant to 11 U.S.C. §§ 547(b) and 550(a) to avoid and recover certain alleged preferential transfers totaling $366,415.24 made by the debtor Appalachian Oil Company, Inc. ("APPCO") to the Kentucky Lottery Corporation ("KLC").[1]  Presently before the court is KLC's motion for summary judgment based on its contention that the transfers constituted trust funds and therefore were not property of the debtor, a necessary element of § 547(b).  APPCO opposes the motion and contends, to the contrary, that it is entitled to partial summary judgment on its claim that the transfers were property of the debtor. As discussed hereafter, both motions will be granted in part and denied in part.  This is a core proceeding.  *See* 28 U.S.C. § 157(b)(2)(F).

I.

On February 9, 2009, APPCO filed a voluntary petition for bankruptcy relief under chapter 11, and thereafter on August 4, 2010, initiated this adversary proceeding.  The following pertinent facts, taken from the amended complaint, the answer, and the parties' statements of undisputed material facts filed in connection with the summary judgment motions, are not in dispute.

At the time of its bankruptcy filing, APPCO operated approximately 57 convenience stores in Tennessee, Virginia, and Kentucky.  At these stores, APPCO regularly sold to the public petroleum products, groceries, cigarettes, other miscellaneous items, and lottery tickets issued by the particular state in which the store was located.  Consequently, in its Kentucky stores, APPCO sold lottery tickets issued by the Commonwealth of Kentucky. The parties' general practice was that KLC collected payment from APPCO for the lottery tickets it sold by issuing each Tuesday an invoice to APPCO for amounts due that week and then sweeping each Thursday APPCO's designated bank account to receive payment of the invoice by electronic funds transfer ("EFT").  During the 90 days prior to APPCO's bankruptcy filing, beginning November 13, 2008, KLC made eleven weekly, successful EFT sweeps of APPCO's bank account in order to receive payment of that week's invoice, with these eleven sweeps totaling $273,491.82.  During this same time frame, an

---

[1] APPCO also seeks under 11 U.S.C. §§ 553(b) and 550(a) to avoid and recover a setoff in the amount of $31,064.94, and avoid under 11 U.S.C. §§ 544(a)(1) and 547(b) the perfection of KLC's liens that occurred during the preference period.

attempted sweep by KLC on January 1, 2009, in the amount of $37,394 was returned because of insufficient funds.  In order to make up the insufficiency, APPCO wired to KLC on January 7, 2009, a payment in this same amount plus an additional $25 for a bank charge reimbursement.  Thereafter, on January 8, 2009, another attempted sweep by KLC was unsuccessful, and again APPCO wired a payment in the amount of the attempted sweep plus $25 for a total wire of $24,439.48 on January 13, 2009.  Lastly, APPC wired the sum of $31,064.94 to KLC on January 22, 2009, in payment of a January 18, 2009 invoice.

The bank account that KLC electronically swept to receive the first eleven payments at issue was a trust account that APPCO maintained at Branch Banking and Trust ("BB&T") in the name of "Appalachian Oil Company, Inc. in trust for the TN Education Lottery Corporation," account no. 930.  The three payments that APPCO wired to KLC were from a general bank account of APPCO's at BB&T, account no. 353.  In this adversary proceeding, APPCO seeks to avoid and recover all fourteen payments, which collectively total $366,415.24, as preferential transfers pursuant to §§ 547 and 550 of the Bankruptcy Code,

In its motion for summary judgment,  KLC asserts that the proceeds from the sale of KLC tickets by APPCO were not property of APPCO but were instead trust funds held for the benefit of KLC, such that the payments by APPCO to the KLC are not subject to avoidance as preferences.  In response, APPCO asserts that no trust was created under Kentucky law and that the parties had a mere debtor/creditor relationship.  Alternatively, APPCO argues that even if a trust were created, KLC's ability to exclude the transfers from the debtor's property is conditioned upon the ability to trace the trust funds to the transfers, which KLC has failed to do.  Further, APPCO argues that the proceeds from the sale of KLC tickets lost their identity as trust funds and became property of APPCO because it commingled the proceeds with non-trust funds.  Based on these arguments, APPCO seeks denial of KLC's summary judgment motion and requests partial summary judgment in its favor on the issue of whether the alleged preferential payments were property of the debtor.

II.

Rule 56(a) of the Federal Rules of Civil Procedure, applicable in adversary proceedings by virtue of Rule 7056 of the Federal Rules of Bankruptcy Procedure, states in part that "[t]he court

shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When deciding a motion for summary judgment, the court does not weigh the evidence to determine the truth of the matter asserted but simply determines whether a genuine issue for trial exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505 (1986). The moving party bears the burden of proving that, based upon the record presented to the court, there is no genuine dispute concerning any material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986); *Owens Corning v. Nat'l Union Fire Ins. Co.*, 257 F.3d 484, 491 (6th Cir. 2001). The burden then shifts to the nonmoving party to come forward with specific facts showing a genuine issue for trial. *Merriweather v. Zamora*, 569 F.3d 307, 313 (6th Cir. 2009). Reliance solely on allegations or denials contained in the pleadings or a "mere scintilla of evidence in support of the nonmoving party will not be sufficient." *Nye v. CSX Transp., Inc.*, 437 F.3d 556, 563 (6th Cir. 2006); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986). The facts and all resulting inferences are viewed in a light most favorable to the nonmovant, and the court decides whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. Nevertheless, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 474 U.S. at 587 (citations omitted).

III.

Subject to certain inapplicable limitations, § 1107(a) of the Bankruptcy Code permits a chapter 11 debtor in possession such as APPCO to exercise the rights of a bankruptcy trustee under the Code. *See* 11 U.S.C. § 1107(a). These rights include the ability of a trustee under § 547(b) to avoid a transfer of an interest of the debtor:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).  As set forth in the prefatory clause of § 547(b), to be subject to avoidance, the transfer must be a transfer of property of the debtor.

As previously noted, the sole question which forms the basis of both KLC's motion for summary judgment and APPCO's responsive motion for partial summary judgment is whether the transfers in question were transfers of the debtor's property.  With respect to this phrase, the Bankruptcy Appellate Panel for the Sixth Circuit has stated the following:

> Although the Bankruptcy Code does not define "property of the debtor," the Supreme Court has found that the term is "best understood as that property that would have been part of the estate had it not been transferred [by the debtor] before the commencement of bankruptcy proceedings." *Begier v. IRS*, 496 U.S. 53, 58, 110 S. Ct. 2258, 2263 (1990).  "In defining 'an interest of the debtor in property' the Sixth Circuit looks to 11 U.S.C. § 541(a)(1), which provides that the property of the estate includes 'all legal or equitable interests of the debtor in property as of the commencement of the case.'" *Spradlin v. Jarvis ( In re Tri-City Turf Club, Inc.)*, 323 F.3d 439, 443 (6th Cir. 2003) (citing *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 849 (6th Cir. 2002)).  In addition, in the absence of controlling federal bankruptcy law, the substantive nature of the debtor's property interest is defined by state law.  *Id.* (citing *In re Cannon*, 277 F.3d at 849; *Jenkins v. Chase Home Mortgage Corp. (In re Maple Mortgage, Inc.)*, 81 F.3d 592, 596 (5th Cir.1996)).

> Moreover, pursuant to 11 U.S.C. § 541(d), "property of the estate" includes all property to which the debtor holds legal title, except "to the extent of any equitable interest in such property that the debtor does not hold."  "Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'  Nor is such an equitable interest 'property of the debtor' for purposes of § 547(b)."  *Poss v. Morris (In re Morris)*, 260 F.3d 654, 670 (6th Cir. 2001) (quoting *Begier*, 496 U.S. at 59, 110 S. Ct. at 2258).

*Meoli v. Kendall Elec., Inc. (In re R.W. Leet Elec., Inc.)*, 372 B.R. 846, 852-853 (B.A.P. 6th Cir.

2007).

In the present case, KLC asserts that the proceeds from the sale of lottery tickets collected by APPCO constituted trust funds held for the benefit of KLC, pursuant to Kentucky law, as set forth by statute and regulation and under the parties' contract.  Turning first to Kentucky law, Ky. Rev. Stat. Ann. § 154A.420(1) provides:

> All proceeds from the sale of lottery tickets received by a person in the capacity of a lottery retailer shall constitute a trust fund until paid to the corporation either directly, or through the corporation's authorized collection representative.  Proceeds shall include unsold instant tickets received by a lottery retailer and cash proceeds of sale of any lottery products, net of allowable sales commissions and credit for lottery prizes paid to winners by lottery retailers.  Sales proceeds and unused instant tickets shall be delivered to the corporation or its authorized collection representative upon demand.  The corporation shall, by administrative regulation, require retailers to place all lottery proceeds due the corporation in accounts in institutions insured by the Federal Deposit Insurance Corporation or Federal Savings and Loan Insurance Corporation not later than the close of the next banking day after the date of their collection by the retailer until the date they are paid over to the corporation.  The corporation may require a retailer to establish a single separate electronic funds transfer account, where available, for the purpose of receiving moneys from ticket sales, making payments to the corporation, and receiving payments from the corporation.  Lottery retailers shall be personally liable for all proceeds.  This section shall apply to all lottery tickets generated by computer terminal, other electronic device, and any other tickets delivered to lottery retailers.

Similarly, the Kentucky Administrative Code states in part:

> All proceeds from the sale of lottery tickets shall be deposited not later than the close of the next banking day after the date of their collection by the retailer and shall be held in an account designated by the retailer to the KLC in the "Retailer License Application" or "Retailer Relicensing Application". The account shall be in an institution insured by the Federal Deposit Insurance Corporation or Federal Savings and Loan Insurance Corporation, or their successors. All proceeds of the sale of lottery tickets, net of credits for compensation due to retailers and for prizes paid by retailers, are the property of the KLC and shall be held by retailers in trust and in a fiduciary capacity for the benefit of the KLC.

202 Ky. Admin. Regs. 3:030 sec. 7(1).

With respect to the parties' contractual relationship, APPCO and KLC first entered into a Retailer License Agreement on July 3, 2003, with the initial agreement being succeeded by a second

and third agreement.  The last one, dated February 9, 2008, was in effect during the relevant times
at issue herein, and states in Section 3 the following:

> Retailer [APPCO] acknowledges that all funds received from the sale of lottery
> tickets, net of compensation due to Retailer by the KLC and credit for prizes properly
> paid by Retailer on winning tickets, constitute a trust fund held by Retailer, in a
> fiduciary capacity, on behalf of the KLC by Retailer and are the property of the KLC.
> Retailer agrees to promptly pay all funds due and owing to the KLC by means and
> in a form acceptable to the KLC, including, without limitation, any funds erroneously
> credited to Retailer's account by the KLC, and any funds which become due and
> owing, or with respect to which the KLC demands payment, after the termination of
> this Agreement and the Retailer License.

Additionally, Section 4 of the Agreement states in part that the "Retailer acknowledges that all
lottery tickets delivered to Retailer shall remain the property of the KLC and are held in trust by
Retailer, in a fiduciary capacity, for the account of the KLC."

Based on the forgoing provisions, KLC asserts that APPCO was required to open a separate
account for the proceeds from the sale of KLC tickets.  KLC admits that the undisputed evidence
in this case is that no separate KLC account was ever established by APPCO.  To the contrary, the
only lottery account that APPCO set up was the Tennessee Lottery trust account at BB&T.
Moreover, APPCO did not segregate the proceeds received from the sale of KLC tickets from its
other revenues. Rather, each night each APPCO convenience store would deposit all of its cash
receipts, including proceeds from the sale of lottery tickets, into a local general bank account, or
with some local stores, into one of APPCO's general bank accounts at BB&T.  Then every day or
every other day, deposits from all of the local accounts were swept by BB&T into APPCO's master
account at BB&T, account no. 957.   From this master account, APPCO regularly paid its vendors
and creditors.  When KLC would present its weekly EFT draft to APPCO's Tennessee Lottery trust
account for payment of the lottery invoice due that week, funds from APPCO's master account were
automatically transferred to the trust account, if there were sufficient funds in the master account
to cover the draft.  In other words, no funds were maintained in the trust account.  Instead, the trust
account kept a zero balance until a draft was made on the account, with funds flowing into the
account in an amount necessary to satisfy the draft.  The evidence indicated that APPCO used the
Tennessee Lottery trust account not only for its electronic payments to the Kentucky and Tennessee
state lotteries, but also to make electronic payments to the Virginia state lottery.

7

Notwithstanding the foregoing practice, KLC asserts that a trust was created in the proceeds from the sale of KLC tickets and that they retained their trust status even though they were commingled by APPCO with non-trust funds.  In response, APPCO argues that no trust was created because there is no requirement, either under Kentucky law or the parties' contract: (1) that APPCO segregate the lottery ticket proceeds from its other funds; (2) that APPCO set up a trust account exclusively for the proceeds; or (3) that prohibited APPCO from using the proceeds for other purposes.

Under Kentucky law, "[t]he four requisite elements of an express trust[2] . . . are: (1) an express intent to create a trust; (2) an ascertainable *res*; (3) a sufficiently certain beneficiary; and (4) a trustee who owns and administers the *res* for the benefit of another (the beneficiary)."  *Acuity v. Planters Bank, Inc.*, 362 F. Supp. 2d 885, 892 (W.D. Ky. 2005) (citing *Cumberland Surety Ins. Co., Inc. v. Smith (In re Smith)*, 238 B.R. 664, 670 (Bankr. W.D. Ky. 1999); *Frazier v. Hudson*, 130 S.W.2d 809, 810 (Ky. 1939)).  Examination of the application statute, regulation, and the parties' contract establish that all four elements are present in the instant case.  Ky. Rev. Stat. Ann. § 154A.420(1) provides that "[a]ll proceeds from the sale of lottery tickets received by a person in the capacity of a lottery retailer shall constitute a trust fund. . . ."  The Kentucky Administrative Code states that "[a]ll proceeds of the sale of lottery tickets  . . . are the property of the KLC and shall be

---

[2] Initially, KLC asserted that its trust was a statutory trust.  However, when APPCO argued in response that KLC did not have an express trust, the focus of the parties' argument turned to an express trust.  Although this court has concluded that the trust created by the parties' retailer agreement was an express trust, it also appears to be a statutory trust pursuant to the language of the applicable Kentucky statute.  This court was not able to locate any Kentucky authority defining a statutory trust, but the Sixth Circuit Court of Appeals has observed that one arises automatically by statute, without notice of filing.  *See Selby v. Ford Motor Co.*, 590 F.2d 642, 645 (6th Cir. 1979).  In contrast, an express trust is created only if the settlor manifests an intention to create a trust.  Restatement (Second) of Trusts § 23 cmt. c (2011).  That intention was manifested in the present case in the parties' Retailer License Agreement.

The Sixth Circuit has expressly recognized that "[s]tatutory trust funds are not property of the debtor and are not subject to the . . . (§ 547) provisions of the new [Bankruptcy] Act." *Id.* at 649; *see also Poss v. Morris (In re Morris)*, 260 F.3d 654, 670 (6th Cir. 2001) (holding that property held in constructive trust is also excluded from property of the estate under § 541(d)).  Therefore, even if an express trust did not exist in the present case, the existence of a statutory trust would be sufficient for purposes of §§ 541 and 547(b) to exclude the trust res from property of the debtor.

held by retailers in trust and in a fiduciary capacity for the benefit of the KLC." 202 Ky. Admin. Regs. 3:030 sec. 7(1). The Retailer License Agreement states in section 3 that "Retailer [APPCO] acknowledges that all funds received from the sale of lottery tickets . . . constitute a trust fund held by Retailer, in a fiduciary capacity, on behalf of the KLC by Retailer and are the property of the KLC." Similarly, the Retailer Agreement states in section 4 that "Retailer acknowledges that all lottery tickets delivered to Retailer shall remain the property of the KLC and are held in trust by Retailer, in a fiduciary capacity, for the account of the KLC." Undeniably, these provisions set forth an express intent to create a trust and specify an ascertainable res, "all proceeds from the sale of lottery tickets." Additionally, both the Kentucky Administrative Code and the Retailer License Agreement indicate "a sufficiently certain beneficiary," because they expressly state that the proceeds are to be held in trust for the "benefit of" and "for the account of" the KLC. As to the last element of "a trustee who owns and administers the res for the benefit of the beneficiary," the regulation and contract identify the "Retailer" as the party who is to hold the proceeds in trust. The retailer in this case, of course, is APPCO.

Admittedly, as APPCO points out, there is no express requirement, either under Kentucky law or in the Retailer License Agreement, that APPCO segregate the trust funds by maintaining them in a separate account or that prohibits the use of the funds by APPCO prior to their payment to the KLC. However, the absence of express provisions requiring segregation and prohibiting alternative use does not appear fatal under Kentucky law to the creation of an express trust, as explained in *Cumberland Surety Ins. Co. v. Smith (In re Smith)*, 238 B.R. 664 (Bankr. W.D. Ky. 1999).

*Smith* was a § 523(a)(4) nondischargeability case arising out of the bankruptcy of four individuals who had guaranteed certain surety bonds for the benefit of their construction company. Rather than segregating the funds that the company had received for its various construction projects, the company had placed the funds in its general operating account, thereby commingling project funds with general operating funds. *Id.* at 668-69. When the company was subsequently unable to pay subcontractors, they made demand on the sureties for payment, with the sureties thereafter seeking to have their indemnity claims against the individuals excepted from their bankruptcy discharge as a defalcation by a fiduciary under § 523(a)(4) of the Bankruptcy Code. *Id.*

9

at 669.  In considering this issue, the bankruptcy court first noted that the Sixth Circuit Court of Appeals has held that § 523(a)(4) requires the existence of an express or technical trust relationship under applicable state law.  *Id.* at 670 (citing, *inter alia, R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176, 179 (6th Cir. 1997)).   Because one indemnity agreement was governed by Pennsylvania law and one indemnity agreement was governed by Kentucky law, the court looked to the law of both states in order to determine whether an express trust had been created.  *Id.* at 670.  After finding that the Kentucky indemnity agreement contained the four essential elements of an express trust under Kentucky law, the court concluded that an express trust was created even though the agreement contained no express segregation requirement. *Id.* at 673. As stated by the court:

> The express trust, itself, was absolutely and automatically created by separate language in the Agreement, without any contingencies or conditions stated.  The existence of the trust was not in any way affected or undermined by the Surety's decision not to . . .  requir[e] a trust account.

> Moreover, the Court notes that the Sixth Circuit has held that a trust agreement's failure to expressly require that trust funds be held in a separate account is "not a determining factor of whether a trust was formed." *Federal Insurance Company v. Fifth Third Bank*, 867 F.2d 330, 334 (6th Cir. 1989) [construing Ohio law].  The requirement that trust funds be held in a separate account is a basic fiduciary obligation automatically owed by the trustee. *Id.* (citing Restatement (Second) of Trusts § 179 (1959)). "When a trust is formed, the trustee has this obligation regardless of the trust agreement wording." *Id.*

*Id*. at 673.

 Thus, *Smith* stands for the proposition that the absence of a segregation requirement in a trust agreement does not preclude the creation of an express trust.  Further, the fact that a trustee fails to segregate trust funds from non-trust funds does not destroy a previously created trust.  *See* 76 Am. Jur. 2d *Trusts* § 287 (2012) ("As a general rule, the commingling of trust funds with other funds does not destroy the identification of the trust funds."); *see also Begier*, 496 U.S. at 60-61 (because statute in question created trust in amount of tax collected or withheld, trust was created when taxes collected or withheld, notwithstanding employer's failure to segregate; to impose a segregation requirement would relegate creation of trust to "debtor's whim"); *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 252 (6th Cir. 1982) ("That the [Michigan Building Contract Fund Act] does not mandate any particular form or procedure in handling trust funds [does

not] undercut[] the validity of the trust . . . .").

Notwithstanding the foregoing authorities, APPCO cites the Sixth Circuit's unreported decision in *Emerson v. Maples (In re Mark Benskin & Co., Inc.)*, 59 F.3d 170, 1995 WL 381741 (6th Cir. June 26, 1995) (table opin.), for the proposition that there is no identifiable trust res in the absence of segregation and therefore no express trust.  However, APPCO has overstated the holding of the case.  *Benskin* involved fraudulent conveyance and preference actions to recover prepetition "profit" payments made by the debtor to investors in the debtor's Ponzi scheme.  *Id.* at *1.  Two investors other than the defendants moved to intervene in the actions, alleging that they had invested funds with the debtor shortly before the debtor had distributed the profit payments to the defendants and that, consequently, the debtor had used their money, which were express trust funds, rather than the debtor's money, to make profit distributions to the defendants.  *Id.* at *5-7.

The bankruptcy court rejected this argument, finding no express trust because the debtor had not segregated the funds entrusted to him, had not treated the funds as trust property prior to the bankruptcy filing, and had depleted the funds of the intervenors from the bank account prior to the bankruptcy filing.  *Id.* at *8.  In the intervenors' unsuccessful appeal to the Sixth Circuit, they argued that they could trace and identify their funds, i.e., the trust res, by applying the "first in, and first out" rule to the bank's internal check posting methodology.  *Id.*  The court of appeals responded, without elaboration, that even if the tracing method was valid, "we are still not persuaded that the intervenors intended to establish an express trust when they gave investment money to Benskin." *Id.*

The Sixth Circuit's decision in *Benskin* does not stand for the proposition that segregation of trust funds is required for the creation of an express trust.  Undeniably, the bankruptcy court in *Benskin* cited the absence of segregation in determining there was no identifiable trust res. However, the court of appeals' response to the intervenors' argument on appeal suggests that the intervenors had adequately addressed the res issue by their tracing allegation, but that the question of intent to create a trust remained.  In contrast with the present case, there was no indication in *Benskin* that there was a trust agreement that set forth an intent to create a trust and identified a trust res.  In the absence of the requisite trust language, segregation or its absence is a relevant factor in

11

determining intent and whether a trust res exists. *See, e.g., Lewis v. Dark Tobacco Growers' Co-op. Ass'n,* 57 S.W.2d 8 (Ky App. 1933) (court considered absence of any requirement that funds be kept separate from other funds in determining whether contract without trust language in fact created trust). Segregation, however, is not essential for the creation of a trust.

Lastly on this topic, APPCO cites three lottery cases from other jurisdictions where the courts in the context of § 523(a)(4) nondischargeability determinations concluded that no express or technical trust had been created. *See Tex. Lottery Comm'n. v. Tran (In re Tran)*, 151 F.3d 339, 345 (5th Cir. 1998) (notwithstanding statute purporting to create a trust in lottery proceeds, no fiduciary relationship within meaning of § 523(a)(4) because no segregation requirement and no prohibition on using lottery proceeds for non-lottery purposes); *Ill. Dept. of Lottery v. Marchiando (In re Marchiando)*, 13 F.3d 1111, 1113 (7th Cir. 1994) (even though statute provided that proceeds from sale of lottery tickets constituted a trust and prohibited commingling of these proceeds with other funds, a § 523(a)(4) fiduciary relationship did not exist because no trust-like duties were imposed on debtor); *N.C. Lottery Comm'n v. Wells (In re Wells)*, 431 B.R. 379, 387 (Bankr. E.D.N.C. 2009) (no express or technical trust created for § 523(a)(4) purposes because contract did not require debtor to maintain or establish separate trust account, lottery forms contemplated that payment would be made from debtor's business account and therefore commingling was foreseeable, and payment of lottery tickets was due at certain specified time, regardless of whether tickets had been sold). However, any reliance by APPCO on these decisions is misplaced. These cases turn on the definition of an express or technical trust in the particular states in which the cases arose and the definition of a fiduciary for purposes of § 523(a)(4). As such, they are inapplicable to the issue of whether a trust was created under Kentucky law, and if so, whether the trust property is excluded from the definition of property of the estate under § 541 of the Code. Based on all of the foregoing, the court holds that the proceeds from the sale of KLC tickets were held in trust for the benefit of KLC and did not constitute property of APPCO.

This conclusion, however, does not necessarily resolve the question of whether the transfers to KLC were transfers of the trust funds, such that they are not subject to avoidance as preferences. The Supreme Court explained in *Begier* that the fact that a debtor held trust funds is insufficient to answer the question of whether the *particular dollars* that the debtor paid to the alleged preference

12

creditor were trust funds or property of the debtor. *Begier*, 496 U.S. at 62 (emphasis in original). Only if the creditor was actually paid with the trust funds has there been no transfer of property of the debtor and therefore no preference. *Id.*

APPCO maintains that KLC has failed to establish that it was paid with trust funds. According to APPCO, when it commingled the trust funds with APPCO's other funds in a non-trust account the trust funds lost their identity. Thus, contends APPCO, it was incumbent on KLC to trace the trust property, which it has failed to do. In support of this proposition, APPCO cites *First Federal of Michigan v. Barrow*, 878 F.2d 912 (6th Cir. 1989). As explained by the Sixth Circuit Court of Appeals in that decision:

> Once the trust relationship has been established, one claiming as a cestui que trust thereunder must identify the trust fund or property in the estate, and, if such fund or property has been mingled with the general property of the debtor, sufficiently trace the trust property. If the trust fund or property cannot be identified in its original or substituted form, the cestui becomes merely a general creditor of the estate.

*Id.* at 915 (quoting 4 *Collier on Bankruptcy* ¶ 541.13 (15th ed. 1988)).

However, a critical distinction between the facts in *First Federal* and the facts in the present case is that the first eleven alleged preferential payments made by APPCO to KLC were not made from APPCO's commingled bank account but from a trust account, albeit a trust account in the name of the Tennessee lottery. In light of this factual distinction, this court believes that the Sixth Circuit's decision in *In re Cannon* is more instructive. *See Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838 (6th Cir. 2002).

In *Cannon*, a Tennessee real estate attorney maintained several escrow accounts to hold clients funds in connection with the clients' real estate transactions. The attorney subsequently began using the funds in the escrow accounts to pay various personal and business expenses, and later made numerous transfers from the accounts to a brokerage company in order to engage in commodities trading. *Id.* at 844. Upon experiencing significant losses from this trading, the attorney filed for bankruptcy relief under chapter 7 (and was subsequently disbarred and imprisoned after pleading guilty to numerous federal crimes). *Id.* at 845. His bankruptcy trustee sought to recover the transfers from the brokerage company as fraudulent transfers under § 548 of the

13

Bankruptcy Code.  Although the bankruptcy court ruled in favor of the trustee, the district court reversed, concluding that the transfers were not property of the debtor attorney, a necessary element of § 548.  *Id.* at 847.  The court of appeals affirmed on the same basis.  *Id.*

In reaching this conclusion, the court first recognized that the client escrow accounts were express trusts and the funds therein trust funds for which the debtor only possessed legal title with equitable title remaining vested in the clients.  *Id.* at 850.  The court observed that "[a]lthough Tennessee law generally treats claimants of an insolvent trust as general creditors rather than beneficiaries unless they trace their property among commingled funds," tracing was not necessary in the case before it because the alleged fraudulent transfers had been from the trust accounts.  *Id.* at 850-51.  And, while the debtor attorney had placed some of its personal funds into the trust accounts, thus commingling trust funds with non-trust monies, under common law trust principles these added personal funds were deemed to constitute trust funds because the debtor had made the deposits in order to repay some of the misappropriated funds.  *Id.* at 851 (citing, *inter alia, Bogert's Trusts and Trustees* § 929 (2d ed. rev. 1984) (explaining that a trustee's later deposits of his own money into a trust account are presumed to be restitution for his stolen funds when the account is expressly labeled a trust account)).  Consequently, the transfers to the defendant from the trust account were not property of the debtor, subject to recovery as a fraudulent conveyance, even though no tracing had been demonstrated.  *Id.* at 851-52.

A similar result was reached in *Suwannee Swifty Stores, Inc. v. Ga. Lottery Corp. (In re Suwannee Swifty Stores, Inc.)*, 266 B.R. 544 (Bankr. M.D. Ga. 2001), under facts more closely aligned with those of the present case.  In that decision, the debtor sought to avoid under 11 U.S.C. § 549(a) postpetition lottery payments to the Georgia Lottery Corporation.  In response, the defendant argued that the payments were trust funds rather than estate property and therefore not avoidable.  As in the present case, the debtor's routine business practice was to initially commingle all of its revenue, along with proceeds from lottery ticket sales, into a general account, even though Georgia law required retailers to deposit lottery proceeds in a separate trust account.  Then, each week, the debtor would deposit into its trust account the amounts needed to satisfy Georgia Lottery Corporation's weekly sweep.  *Id.* at 547.  It was these post-petition sweeps by Georgia Lottery Corporation out of the trust account that the debtor sought to avoid.

14

The bankruptcy court concluded that Georgia law created a statutory trust in favor of the Georgia Lottery Corporation in all proceeds from the sale of lottery tickets. *Id.* at 549 (citing Ga. Code Ann. § 50-27-21(a)). The court further concluded that it was unnecessary for the Georgia Lottery Corporation to perform any tracing to establish that it was actually paid with trust funds, citing, in part,[3] the common law presumption that a trustee is restoring a beneficiary's trust funds when it adds funds to a depleted trust account. *Id.* at 553 (citing *Bethlehem Steel Corp. v. Tidwell*, 66 B.R. 932, 942 (M.D. Ga. 1986)); *see also* Restatement (Second) of Trusts § 202, cmt. m (2011).

Applying *Cannon* and *Suwannee Swifty Stores*, along with the common law trust presumption applied therein, to the present case, the court concludes that the payments from the trust account to KLC were payments of trust funds rather than funds of APPCO even though no tracing has been demonstrated. By setting up the trust account to pull funds from APPCO's master account when it was drawn upon by KLC's weekly EFT sweep, APPCO in essence created a systematic, electronic means of restoring the trust funds that it should have been depositing in the trust account all along. This restoration of trust funds is conclusively presumed to be trust funds, as the *Cannon* decision directs, regardless of the source of these funds. *See In re Cannon*, 277 F.3d at 851-52.

---

[3] The primary basis of the court's ruling was the *Begier* decision, with the bankruptcy court concluding that it stood for the proposition that a voluntary payment, "regardless of its source," is conclusively presumed to be from the trust corpus. *Id.* at 552. In reaching this conclusion, the *Suwannee Swifty Stores* court cited *Begier's* description of a § 7501 Internal Revenue Code trust, a trust created in an "abstract amount" without regard to the source of the funds, and concluded that the statutory trust in lottery proceeds was the same type of trust. *Id.* at 553 (citing Begier, 496 U.S. at 66-67).

This court respectfully disagrees with this aspect of the *Suwannee Swifty Stores* decision. Like the trust in the present case, the trust in *Suwannee Swifty Stores* was not in an abstract amount without regard to source; rather the trust was in specific property from a particular source, proceeds from the sale of lottery tickets. *Cf.* Ga. Code Ann. § 50-27-21(a) ("All proceeds from the sale of the lottery tickets or shares shall constitute a trust fund until paid to the corporation . . . . Proceeds shall include unsold instant tickets received by a lottery retailer and cash proceeds of the sale of any lottery products, net of allowable sales commissions and credit for lottery prizes sold to or paid to winners by lottery retailers.") *with* Ky. Rev. Stat. Ann. § 154A.420(1) ("All proceeds from the sale of lottery tickets received by a person in the capacity of a lottery retailer shall constitute a trust fund until paid to the corporation . . . . Proceeds shall include unsold instant tickets received by a lottery retailer and cash proceeds of sale of any lottery products, net of allowable sales commissions and credit for lottery prizes paid to winners by lottery retailers.").

15

Accordingly, tracing is not necessary in this instance to establish that KLC was actually paid with trust funds. *Id.*; *see also Kupetz v. United States (In re Cal. Trade Technical Schs., Inc.)*, 923 F.2d 641, 647 (9th Cir. 1991) (restored funds in a trust account are not subject to the tracing requirement); *Flint Ink Corp. v. Calascibetta*, No. 06-2517, 2007 WL 2687415, *10-11 (D.N.J. Sept. 10, 2007) (transfer from segregated account which contained express trust funds not subject to avoidance as preference even though debtor had commingled personal funds in the account); *Watts v. Pride Utility Constr. (Matter of Sudco, Inc.)*, No. 05-1134, 2007 WL 7143065, *7 (Bankr. N.D. Ga. Sept. 27, 2007) (recognizing presumption that replenished funds are trust funds when deposited into a segregated trust account). The court finds it irrelevant that the trust account from which KLC was paid was established in trust for the Tennessee lottery. Because the account was a zero balance account, funds flowed through the account only in response to an EFT sweep by a particular state lottery such that the funds were never commingled in the account. Moreover, to the extent the funds were commingled therein, the law remains that the funds in the account are presumed to be trust funds rather than funds of the debtor APPCO. As stated by the Sixth Circuit in *Cannon*, "the commingling of funds held in express trust in the escrow accounts does not alter their character, and these funds remain outside the estate . . . ." *In re Cannon*, 277 F.3d at 851. Because the first eleven payments to KLC were not property of the debtor APPCO, KLC is entitled to summary judgment on APPCO's claim to recover these payments as preferential payments of property of the debtor.

With respect to the three payments that APPCO wired to KLC from an APPCO general account, no common law presumption saves KLC from the tracing requirement. In response, KLC argues that the voluntary payment of trust funds during the course of the preference period established the required nexus between the funds paid and the trust such that tracing is not required, citing *Begier*, 496 U.S. at 67. In *Begier*, the Court considered whether prepetition payments of withholding and excise taxes to the IRS from the debtor's general operating account could be avoided and recovered as bankruptcy preferences. *Id.* at 53. The Court initially concluded that these taxes were statutory trust funds pursuant to a provision of the federal tax code, 26 U.S.C. § 7501, which states that "the amount of [trust-fund] tax . . . collected or withheld shall be held to be a special fund in trust for the United States." *Id.* at 61-62. The Court then turned to the question of whether the IRS was actually paid with the trust funds. *Id.* at 62. Because § 7501 gave no guidance

on this issue, the Court looked to common law tracing rules but found them unhelpful since they were designed for a system in which particular property is identified as the trust res. *Id.* at 62-63. By contrast, "[a] § 7501 trust is radically different from the common-law paradigm" because it creates a trust in "an abstract 'amount'–a dollar *figure* not tied to any particular assets–rather than in the actual dollars withheld." *See id.* at 62 (emphasis in original).

Unable to find the answer in the statute or in common law principles, the Supreme Court turned to the legislative history of § 547 and § 541 of the Bankruptcy Code, the latter of which defines property of the estate. The Court noted that prior to the enactment of the Bankruptcy Code in 1978, the Court in *United States v. Randall*, 401 U.S. 513 (1971), had refused to permit a bankruptcy debtor to make postpetition payments of trust fund taxes to the IRS ahead of administrative expenses. Unhappy with this ruling, Congress addressed the issue in the 1978 Code by expressly providing in § 541 that property of the estate would not include property held in trust for another. In a House Report, one Congressman discussed the effects of the new statutory language on the rule established in *Randall*:

> [A] serious problem exists where "trust fund taxes" withheld from others are held to be property of the estate where the withheld amounts are commingled with other assets of the debtor. The courts should permit the use of reasonable assumptions under which the Internal Revenue Service, and other tax authorities can demonstrate that amounts of withheld taxes are still in the possession of the debtor at the commencement of the case.

H.R. Rep. 95-595, at 549 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6500.

The Supreme Court in *Begier* concluded that these the same "reasonable assumptions" should apply to prepetition payments of trust-fund taxes to the IRS, but queried how extensive the "required nexus" between the trust and the payments should be. *Id.* at 66. The Court found the answer in the following House Report:

> A payment of withholding taxes constitutes a payment of money held in trust under Internal Revenue Code § 7501(a), and thus will not be a preference because the beneficiary of the trust, the taxing authority, is in a separate class with respect to those taxes, if they have been properly held for payment, as they will have been if the debtor is able to make the payments.

H.R. Rep. 95-595, at 373 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6329.

17

Based on the foregoing, the Court held that "[t]he debtor's act of voluntarily paying its trust-fund tax obligation therefore is alone sufficient to establish the required nexus between the 'amount' held in trust and the funds paid." *Begier*, 496 U.S. at 66-67. Because the debtor in *Begier* had voluntarily paid its trust-fund tax obligation to the IRS, the Court held that it was unnecessary for the IRS to perform the common-law tracing in order to prevail in the preference action against it. *Id.*

In the present case, the KLC maintains that it, too, is not required to trace the payments received by it from the debtor's commingled general account to the trust funds because APPCO voluntarily made the payments, thereby providing the required nexus. This court disagrees. The Supreme Court in *Begier* was focused solely on trust-fund taxes pursuant to § 7501 of the Internal Revenue Code for which common-law tracing principles could not be applied because the trust res as defined by statute was in an abstract dollar "*amount*" rather than specific property, the common-law paradigm. In fact, the court even utilized the phrase "special context" to describe how the issue before it arose. In contrast, the trust res in the present case is not in an abstract "amount."[4] As

---

[4] In its responsive brief, KLC disputes this point. KLC initially asserts that there is an "ascertainable trust res" in this case such that the second required element of an express trust under Kentucky law is satisfied: proceeds from the sale of lottery tickets and unsold lottery tickets. KLC then somewhat inconsistently argues that "proceeds" is not limited to the particular monies given in exchange for lottery tickets when they are sold or actual unsold lottery tickets in the possession of the retailer. According to KLC, the trust res includes the *dollar value* of unsold instant lottery tickets–an abstract amount–just like the trust res in *Begier*. KLC arrives at this conclusion by noting that the weekly invoice issued to a retailer is not based on actual ticket sales but, with respect to instant lottery tickets, requires payment 30 days from ticket activation date or 50 days from game start date, whichever comes first, regardless of whether the instant tickets have actually been sold. Consequently, maintains KLC, the cash value of the tickets, an abstract amount, is substituted for the tickets themselves as a trust asset. As authority for this assertion, KLC cites *Martin v. Buechel*, 218 S.W. 278, 279 (Ky. 1920), wherein the court defined "proceeds" as "the sum, amount, or value of goods sold or converted into money."

The 1920 *Martin* decision did reference a legal dictionary definition of proceeds as "money or articles of value arising or obtained from the sale of property. The sum, amount, or value of goods sold or converted into money." *Id.* at 79 (quoting *Bouvier Law Dictionary*). However, the court therein did not apply the definition in the broad sense urged by KLC. Rather, the issue before the court in *Martin* was the authority of an executor to sell the decedent's real property under a will that specified that "all business pertaining to the estate be settled in full, and proceeds be divided between my children," when the decedent had engaged in no business and the only business of the

(continued...)

18

previously described, the trust res is identified both in the retailer contract and by statute as specific property: proceeds from the sale of lottery tickets and unsold tickets in the retailer's possession. There was simply no indication in *Begier* that the Court was abandoning the traditional tracing rule in contexts outside of § 7501 trusts or for trusts which continue to fit within the common-law paradigm. *See Wyle v. S&S Credit Co. (In re Hamilton Taft & Co.)*, 53 F.3d 285, 290 (9th Cir. 1995), *vacated as moot*, 68 F.3d 337 (1995) (observing that it should not "extend the holding in *Begier* more broadly than is necessary to accomplish its purposes when doing so necessarily undermines the Bankruptcy Code's core principle of equality of distribution among creditors" and that "[i]n the absence of any clear policy reason for extending *Begier*, we apply the common law of trusts"); *United States v. Borock (In re Ruggeri Elec. Contracting, Inc.)*, 214 B.R. 481, 486 n.3 (E.D. Mich. 1997) ("Almost without exception, the Bankruptcy Courts have interpreted the Supreme Court's reasonable assumptions test [in *Begier*] narrowly."); *Official Comm. of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc. (In re Catholic Diocese of Wilmington, Inc.)*, 432 B.R. 135, 156, 151 (Bankr. D. Del. 2010) ("The *Begier* Court deviated from the common law tracing rules

---

⁴(...continued)
estate was the real property itself. *Id.* at 278. The court concluded that the decedent had intended that the real property be sold, since there would be no proceeds to divide absent a sale. *Id.* at 279. Thus, notwithstanding the potentially broad definition of proceeds set forth in the decision, the *Martin* court applied the definition in its traditional sense, the actual money obtained from a sale of property.

Moreover, the state statute in the present case is dissimilar to the federal statute in *Begier*. The former identifies the trust res as "proceeds from the sale of lottery tickets," with proceeds including "unsold instant tickets received by a lottery retailer." *See* Ky. Rev. Stat. Ann. 154A.420(1). No reference is made to "dollar value" or "amount" of these tickets or proceeds, in contrast to the statute in *Begier*, which expressly identified the trust res as "the *amount* of tax collected or withheld." *Begier*, 496 U.S. at 53 (quoting 26 U.S.C. § 7501). Accordingly, the court rejects the assertion that the trust at issue in the present case is a type of "floating trust," as was the case in *Begier*. *See Begier*, 496 U.S. at 71 (J.Scalia, concurring).

Similarly, the court rejects KLC's argument that its trust is analogous to the statutory trust provided by the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499e, *et seq*. By regulation, the assets in a PACA trust "are to be preserved as a nonsegregated 'floating' trust. Commingling of trust assets is contemplated." 7 C.F.R. § 46.46(b); *see also In re Fresh Approach, Inc.*, 51 B.R. 412, 422 (Bankr. N.D. Tex. 1985) (PACA trust imbued with unusual floating characteristic, regardless of source; legislative history to statute emphasizes that no specific tracing of inventory or proceeds is required). In contrast, there is no indication in the present case from either the parties' contract or Kentucky law that a floating trust is contemplated.

19

not because it found them lacking" but "due to the unique facts and circumstances raised by the specific type of trust at issue in the case.  As such, the holding in *Begier* should be narrowly construed and the nexus test should only apply in cases where a court is faced with facts similar to those in *Begier*."); *Johnson v. Barnhill (In re Antweil)*, 154 B.R. 982, 987 (Bankr. D.N.M. 1993) ("*Begier* deals with a unique type of situation, a trust created for the benefit of the Internal Revenue Service.").

Consistent with this conclusion, courts have generally continued to require common-law tracing for alleged trust payments outside the trust-fund tax context.[5]  *See, e.g., Stoebner v. Consumers Energy Co. (In re LGI Energy Solutions, Inc.)*, 460 B.R. 720, 726 (B.A.P. 8th Cir. 2011) (utilities who had received payments from general account of debtors who provided utility management and billing services had to establish trust relation and trace funds to prevail in preference action); *In re R.W. Leet Elec., Inc.*, 372 B.R. at 855 (prepetition payments from debtor's commingled account subject to avoidance absent tracing of funds held in statutory trust under state contractors act); *Daly v. Radulesco (In re Carrozzella & Richardson)*, 247 B.R. 595, 601 (B.A.P. 2nd Cir. 2000) (preference defendant had burden of tracing their payments to express trust res); *In re Catholic Diocese of Wilmington, Inc.*, 432 B.R. at 158 (alleged beneficiaries of resulting trust bore burden of identifying and tracing trust funds if they have been commingled with non-trust funds in non-trust account); *In re Philip Services Corp.,* 359 B.R. at 628 (requiring tracing for commingled express trust funds under state contractor act); *but see In re Suwannee Swifty Stores, Inc.*, 266 B.R. at 552-53 (tracing not required under *Begier* to protect from avoidance under § 549 of the Bankruptcy Code unauthorized postpetition transfers of trust funds by the debtor to the Georgia Lottery Corporation); *EBS Pension L.L.C. v. Edison Bros. Stores, Inc. (In re Edison Bros, Inc.)*, 243

---

[5] Most courts have limited *Beiger* exclusively to § 7501 trust fund taxes, although a few, including the Third Circuit Court of Appeals, have extended its holding to other types of trust-fund taxes.  *See, e.g., City of Farrell v. Sharon Steel Corp.*, 41 F.3d at 98-99 (finding no significant distinction between § 7501 trust for federal withholding tax and trust created under Pennsylvania law for local income taxes, the court concluded that common law tracing rules did not apply).  This extension has been based in part on the language in *Beiger* quoted from the House Report stating: "The courts should permit the use of reasonable assumptions under which the Internal Revenue Service, *and other tax authorities*, can demonstrate that amounts of withheld taxes are still in the possession of the debtor at the commencement of the case."  *Beiger*, 496 U.S. at 65 (quoting H.R. Rep. 95-595, at 549 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6500) (emphasis supplied).

B.R. 231, 240 (Bankr. D. Del. 2000) (concluding that although *Begier* dealt with taxes, its holding applied equally to all constructive trust cases under § 541(d)).

Because *Begier* is not applicable to the case at hand, it is necessary for KLC to trace the three wired payments it received from APPCO's commingled bank account to the trust funds collected on KLC's behalf.   In its responsive memorandum of law, KLC suggests that tracing has been established because "online lottery ticket sales and activation of instant lottery ticket packs can be traced through [KLC's] internal computer tracking system."  KLC adds that APPCO's bank records demonstrate that proceeds from the sale of lottery tickets came from APPCO's individual stores to APPCO's general accounts and then to KLC.   However, these general tracing allegations are insufficient to establish the degree of specificity required when trust funds have been commingled in a debtor's general account. As stated by the Sixth Circuit of Appeals in *First Federal of Michigan v. Barrow*:

> The situation frequently occurs where trust funds have been traced into a general bank account of the debtor.  The following general principles have been applied. The bankruptcy court will follow the trust fund and decree restitution where the amount of the deposit has at all times since the intermingling of funds equaled or exceeded the amount of the trust fund.  But where, after the appropriation and mingling, all of the moneys are withdrawn, the equity of the cestui is lost, although moneys from other sources are subsequently deposited in the same account.  In the intermediate case where the account is reduced to a smaller sum than the trust fund, the latter must be regarded as dissipated, except as to the balance, and funds subsequently added from other sources cannot be subject to the equitable claim of the cestui que trust.  If new money is deposited before the balance is reduced, the reduction should be considered to be from the new money and not from the monies held in trust.  This analysis may be referred to as the lowest intermediate balance test.

878 F.2d at 916 (quoting 4 *Collier on Bankruptcy* ¶ 541.13 (15th ed. 1988)); *Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F. 3d 718, 723-24 (4th Cir. 1998) (courts resort to LIBT when trust funds are commingled with other funds in a general corporate account); *Greenwald v. Center Line Elec., Inc. (In re Trans-End Technology, Inc.)*, No. 97-6119, 1998 WL 542331, *6 (Bankr. N.D. Ohio 1998) (court utilized the LIBT to determine whether alleged preferential payments out of debtor's commingled bank account were trust funds).

Lastly in this regard, KLC argues that APPCO is judicially estopped  from claiming that

KLC must trace the payments received by it to the trust funds in order to prevail in this action.  In support of this contention, KLC points out that shortly after APPCO's bankruptcy filing, it filed a motion seeking authority to enter into post-petition financing arrangements with the Kentucky, Virginia, and Tennessee state lotteries, which motion set forth the statements that no monies were owed to the state lotteries for prepetition sales and that the lotteries had no prepetition claims against APPCO. By order entered May 4, 2009, the court granted APPCO's motion.  Consequently, maintains KLC,  because of the admissions set forth in the motion, APPCO is precluded from characterizing the prepetition payments to KLC as anything other than lottery ticket proceeds.

In response, APPCO states that notwithstanding the court's granting of the financing motion, APPCO never entered into any postpetition financing arrangements with any of the state lotteries, including KLC.  APPCO also sets forth the elements of the judicial estoppel doctrine and argues that they are not present herein.  Finally, APPCO observes that judicial estoppel is an affirmative defense which must be raised in a party's answer pursuant to Federal Rule of Civil Procedure 8(c), that KLC did not raise the defense in its answer, and that, therefore, KLC has waived the defense.

The court agrees with APPCO that the judicial estoppel doctrine is not applicable to the case at hand. As explained by the Sixth Circuit Court of Appeals:

> Judicial estoppel forbids a party from taking a position inconsistent with one successfully and unequivocally asserted by that same party at an earlier proceeding. . . .
>
> The Supreme Court has developed three factors we are to consider when determining whether to apply the doctrine of judicial estoppel. "First, a party's later position must be 'clearly inconsistent' with its earlier position."  Second, we may consider whether the party has successfully persuaded a court to accept his previous position, "so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that the first or second court was misled.'" Finally, we may consider "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

*Pennycoff v. Fentress County Bd. of Educ.*, 404 F.3d 447, 452 (6th Cir. 2005) (internal citations omitted).

Applying these three factors to the case at hand demonstrates immediately the fallacy of

KLC's argument.  The first factor, whether a party's later position is "clearly inconsistent" with its earlier position, is not present. APPCO's assertions in this adversary proceeding that the lottery ticket proceeds were not held in trust, and that even if they were, KLC must trace in order to prevail in this action are not contrary to any statement made by APPCO in its financing motion. The motion did not mention APPCO's preference claims or address whether the parties had a trust relationship. Merely stating that the parties had no outstanding prepetition obligations against each other is not clearly inconsistent with APPCO's present claim that some of the prepetition payments to KLC were preferential and thus avoidable.  Similarly, the second and third factors are absent.  Nothing in this adversary proceeding suggests to this court that it was misled by the financing motion or that APPCO would derive an unfair advantage if it were not estopped from raising the tracing argument. Accordingly, KLC's judicial estoppel argument is without merit.

Based on the foregoing, the court concludes that APPCO is entitled to partial summary judgment based on its contention that the three wired payments it made to KLC from its general account represent property of the debtor.  As discussed in *Leet Electric*, although a party seeking to avoid a preference has the burden of establishing all of the elements of a preference under § 547(b), *see* 11 U.S.C. § 547(g), APPCO met this burden by evidence that KLC was paid from APPCO's general account.   *See In re R.W. Leet Elec., Inc.*, 372 B.R. at 855-57.   Faced with APPCO's properly supported request for partial summary judgment on the question of whether KLC was paid with property of the debtor, it was incumbent on KLC to come forward with evidence demonstrating the required tracing or otherwise suggesting that there is a genuine issue of material fact on this issue.  *Id*. at 856 (citing, *inter alia, In re Carrozzella & Richardson*, 247 B.R. at 602 (once the trustee establishes that the creditor was paid from the debtor's commingled general account, the burden shifted to creditor to prove that debtor only had legal title and to trace its interest in the commingled funds)).  KLC having failed to meet this burden using the lowest intermediate balance test, its motion for summary judgment must be denied and APPCO's granted.

IV.

In summary, the court concludes that the eight payments totaling $273,491.82 made by APPCO to KLC during the 90 days prior to APPCO's bankruptcy filing were trust fund property

rather than property of the debtor.  Accordingly, KLC is entitled to summary judgment in its favor as to APPCO's claim that these payments represent avoidable preferences under 11 U.S.C. § 547(b). Regarding the three wired payments totaling $92,923.42 made by APPCO to KLC in January 2009, the court concludes that these payments were property of the debtor APPCO.  Therefore, APPCO will be granted partial summary judgment on these claims, and KLC's motion for summary judgment will be denied.  The court will enter an order consistent with this ruling.

# # #